1731.11 United States of America v. Johnathan Holt Arguments not to exceed 15 minutes per side. Mr. Jagger for the appellant. Good morning. May it please the court, my name is Stephen R. Jagger and I represent Johnathan Holt. I do reserve two minutes for rebuttal. Johnathan Holt is interrogated by federal and state law enforcement officials in circumstances in which a reasonable person would believe that he was not at liberty to either terminate the interrogation or leave. The district court's analysis of whether this interrogation is custodial is incomplete. The conclusions that it was non-custodial is erroneous. The reason I say that is because this is a case that has to be looked at in the context in which the interviews or interrogation took place. The district court did not look at much beyond the four prongs in the Hinojosa case. Particularly important is the timing of whatever warnings were given. The context of the case is important because Mr. Holt was subpoenaed by the grand jury to appear at the federal courthouse on August 24, 2014. He was subpoenaed to give physical evidence only. A DNA sample, the taking of a picture, and a handwriting sample. Prior to the meeting, federal and state agents, including the Assistant United States Attorney, had a meeting and plan to ask him questions. So the interrogation was pre-planned before he got there. The specific goal was not only to get this physical evidence, but also to get statements from Mr. Holt. The government wanted to get statements from him to try to have him lead the investigators to other individuals who were members of this short North posse. Holt appears on August 18. Remember, he's a paraplegic, he's in a wheelchair. He's separated from his girlfriend slash caregiver. And within two or three minutes of his arrival, the questioning begins. The questions for which he was subpoenaed. Was he told anything before the questions began? That he was free not to answer the questions or anything like that? There is some testimony about that, but there are conflicts in the testimony. If you drill down to the details of this case, there's conflict in the sequence of events within the interrogation itself. The AUSA testifies that there were some warnings given, but they were never intended to be Miranda. The antecedent question is whether he's in custody, right? That's correct. Wasn't he told he was free to leave? He was told he was free to leave. The question is, when was he told he was free to leave? And did the free to leave circumstance change during the course of the interrogation? Well, was he told he was free to leave before he was asked any questions? Do we know the answer to that? There's conflict in the testimony about that? But what did the district judge find after hearing the conflict in the testimony? The district court found that he was told that he was free to leave, but the issue with the case is that decision was made without a complete consideration, I believe, to the context of the case and when these warnings were given. How meaningful were they? First of all, he was told he was there to get physical evidence. The questioning starts pretty much when he got there, okay? But if he was told, say he got there and say the first thing out of the AUSA or the agent's mouth is, you're here to give physical evidence, but we have some questions. You don't have to answer the questions. You're free to leave as soon as you give us the physical evidence. If that had happened, there wouldn't be any in custody situation, right? I don't think it's dispositive in this case. I think in some cases that may be dispositive. I don't think it is in this case. Because later on he could, of course, be put into custody. But apart from that, if he then says fine and the first question is did you murder the victim and he says yes, in my hypo, which is not what happened, but then there would be no problem because he'd been told he's not in custody and he just blurts out, yes, I murdered the victim. In that hypo, wouldn't we have to rule against you? That hypo isn't what happened here, but perhaps you would in that case. I can see that that's sometimes dispositive of the case. I don't think it is here. Let's look at the facts of the case for a second because I think that's what's really important and what the district court failed to do. He is told that, and again there's conflicting about when this statement is made, but he is told these generic type of Miranda warrants he'd never get a waiver from. He's told these generic warrants which include you're free to leave, we're going to ask you some questions, we want you to give this evidence. But the threat of a warrant is also stated. Now, we don't know when that exactly takes place. The AUSA tells him you're here to give this stuff, if you don't give it, we're going to get a warrant for you and the court's going to force you to give this information. But they never give him the opportunity to do that. They start with the questions and somewhere along the line somebody comes in and takes a photograph. It's not at the very beginning, I think after the question's already started. The samples aren't taken until much later. The threat of a warrant, you're talking about a warrant to do what? To force him to give the information, I assume. It's not really clear, but I believe that the threat of the warrant is objectively and reasonably interpreted, or could be interpreted, is in order to stay and complete the government's request. A request to produce the physical evidence, right? Right, but he's not in control. The government has a home field advantage. He can't say give me this stuff, I'm leaving. He was subpoenaed by the grand jury to appear and he appears to give the physical evidence. Correct, not to answer questions. So normally you don't have a warrant to ask questions, do you? You have a warrant to search a property or to arrest a person or here to provide the physical evidence, the DNA evidence. But if we look at it from an objective standpoint, you're free to leave. We want you to comply with the subpoena. If you don't do it, we're going to get a warrant for you. Then you begin to ask questions, and you don't offer him the opportunity to comply with the subpoena until much later. But could he have said, you know what, I don't want to answer your questions. I'd like to do what the warrant requires, give my DNA, get my picture taken, and I'm out? Yes, he could have said that. He didn't. But there's also testimony in this case that, that's why I think the timing is very critical in this case, because what happens is there's testimony that's kind of incredulous, actually, from the government officials who were there. There are two state officials, two, I believe, two federal agents in AUSA, maybe another prosecutor comes in and out. What happens is he actually says to them that their testimony is his will was never ever come, he never showed discomfort. Okay? Look at what the testimony really is. And by the way, the district court says this is a very close question in its mind. And I want to end with that because it's something very important that he says. But what happens is there is testimony, though, that they all, at different times, watch him rocking back in his wheelchair. He pulls his shirt over his head. He puts his shirt down. It is, the question intensifies. And again, looking at the facts, the question does intensify during the course of this hour and 45 minutes to two hours. Detective, I believe it's Detective Gillette, who was the one who didn't record this thing, describes it as a tough interview. He's not, they're not getting the answers that they anticipated that they would get. He admits that as the interview progresses, law enforcement agents press Mr. Holt. You'll find that in the transcript 1521, which is the second hearing that was held during the course of the trial. The testimony from the government changes between the pre-trial suppression hearing, which is transcript 1090, and the trial testimony, which is transcript 1521. Detective Sackman testifies, all law enforcement agents are present during the course of this interview in this room. All of them are participating in the questioning at the same time. They're conferring inside and outside of the courtroom. But as I say, he never displays any discomfort. He never says, I'm going to leave. He's been warned, if you don't do what we want you to do, we're going to get a warrant. They're pressing him and asking these questions. They're conferring outside the courtroom. He's been taken through two levels of security, up four floors, internal offices. He has no control of the situation whatsoever. He's separated from his caregiver, who by the way is also questioned in the lobby, waiting for him to finish. So it's clearly a pre-planned interrogation. The court comments about this situation are kind of mystifying to me, because what the court says is, at the suppression hearing, the re-hearing during trial, what the court says, I'll put it to you like this, government. Had this been essentially the same as it was when I considered this, I'm assuming referring back to the pre-trial hearing, I don't know whether the outcome would have been the same. Well if the outcome wouldn't be the same in future cases, why is it the way it is in this case? That's mystifying to me. The court tells them further, the government is hanging on the skinniest of threads. Don't let this happen again. Now there he's referring to the fact, or the judge is referring to the fact, that although the state policy was to record the interview, this interview was not recorded because there were dead batteries in the recorder. And they didn't bother to delay it to walk to the next office and get batteries. So the court gets pretty upset about that and says government, you're acting at your own peril if this happens again. But how does that correlate to the question of whether he was in custody? I think the lack of a record is pretty important. If there would have been a record here, we would know when these warnings were given. We would have known if the warnings were meaningful or not. I don't understand why the warnings weren't given, a waiver gotten, and then the questioning started. What's the standard that we're looking at this under? I think it's the biggest question in law and facts, so I think you have to look at it day and over. What about the district court's findings of fact with regard to the custodial question? On the credibility issue? You have another one in the order that he issued. What are we looking at there with regard to the court's findings of fact? I think the credibility determination, if that's what you're asking about, Judge, is that... No, I'm asking about the findings of fact that the district court made with regard to whether or not your client was in custody. The court finds that he was not in custody. The court examines in its opinion, both from the first suppression hearing and kind of readopts it during the course of the trial, that he believes that Mr. Holt was told he was free to leave. He doesn't consider when the warnings were given or what was happening at the time. He makes a finding, I believe... Would that be enough for us to find that his findings were clearly erroneous? I don't think it is clearly erroneous. I don't think it's dispositive because the court only addresses the length of the questioning. By making these credibility determinations, she doesn't examine the manner of the questioning. The intensifying questioning, the pressing for answers, I don't think the court ever really addresses that. The location issue, the court addresses and says there's other comparable cases where the location here at the courthouse really doesn't make any difference. The cases the government relies on and the court relies on are more interviews that took place at either homes or places of employment. That's not what happened here. I think there are some restrictions on the freedom of movement. That's really the test here. Would a reasonable person recognize that they could terminate this and leave? Despite what they're told under the circumstances of this case, I don't think a reasonable person would. I think I'm out of time. Thank you. Thank you. May it please the court, Kim Robinson on behalf of the United States. In light of the argument this morning, I will focus on suppression. The warnings that were given, the court is correct. Before the questioning began, Mr. Holt was told of his right to remain silent and told that he was free to leave. The district court found that in its opinion and there was in fact no conflict about that in the testimony in the suppression hearing and the testimony at trial. He wasn't given complete Miranda warnings. He was given a partial. Correct. The only one that was missing was I believe the right not to do anything that he said could be used against him, but all of the others were given. Or that an attorney would be provided. I believe that an attorney would be provided was indicated. Who said that that warning was given and when was that? I believe it was one of the officers in the suppression hearing. Because he appeared without an attorney. That's correct. Both the right to remain silent and the free to leave warnings were given before asking any questions. After he gave the first statement about his involvement in the robbery, he was told to leave and get an attorney. Because the United States was still interested in using him as a witness. Why didn't he go? It's unclear. That was the point at which he pulled the shirt over his head and then proceeded to give the statement. In this case, it's obviously a very large case and a number of witnesses were called in using a subpoena similar to this and many of them did not give statements. Mr. Holt did. You are correct that he could have refused. There is no conflict in the testimony about the nature of the statements that he gave. There were no contrary witnesses about what Mr. Holt said in the interview. And there is no conflict about the core warnings that he was given. Strong and repetitive warnings before he began questioning. And you are correct that the subpoena did not require him to answer any questions. The subpoena also provided the opportunity for him to meet with the officers, meet with one of the officers outside of the courthouse and provide the information. So it was a particularly strong and clear indication that he did not have to answer questions. When you said the subpoena said he could meet outside the courthouse, did the subpoena say where he was supposed to provide the DNA and the photographic evidence? The subpoena asked him to come to the courthouse but it indicated that he could provide alternate arrangements or arrange with the officer to provide them at another time and place. He did not do that. So I think the core of this is the warnings that were given both at the beginning and after he gave the first statement. It would be difficult for him to argue that those were not conclusive here. Well, wouldn't a reasonable person not feel free to leave under the circumstances of being in the courthouse in a room that's isolated and with four or five law enforcement officers asking him lots and lots of questions about what was going on in this very serious situation? No. As this court has said before, interviewing at the courthouse, even having been driven by a police officer, does not mean that a person is in custody or not free to leave, particularly in light of the warnings that were given. So four officers of the court is not a large number under the cases of this court. And the fact that it is at the courthouse is not dispositive or even a strong indicator of custody. So how old was he?  Something like that? Approximately. And was not just a paraplegic but it was from the chest down. He couldn't really maneuver himself very well. Right. And I've not seen any cases in which a particular individual's lack of movement was dispositive or even a large factor, a factor considered by this court, a court in fact. Well, there probably aren't that many cases. Right. So I don't know how that cuts. Right. And he could, you're correct, that he could not open the door by himself, but he could wheel himself. But the core question here is whether he could stop the interview. And the warnings make it clear that he could. So... So what if there's concern about what exactly the warnings were and when they were given? And the fact that there was not the ability to tape record the interview because of the purported lack of batteries, all leading to questions. And then the district judge having the two hearings, both at the motion to suppress stage and then during the trial, the district judge expressing a lot of dismay as to what was really happening. Why shouldn't all of that point to concern on our part that there was in custody situation where Miranda warnings should have been given? It's very easy to get somebody to sign off on Miranda warnings and have a written statement. I'll address the conflict and then the tape recording. And I'll address Miranda warnings first because this is a short one. I think it's important to say that it's not necessary for Miranda warnings to be given here because he wasn't in custody. It's the practice of our office to give them as to make it clear that he was free to leave. The AOSA here didn't have the card with him. He gave all the ones he remembered and admitted one. But the omission, I think, rather than weighing toward custody, the fact that most of them and most importantly, the fact that he did not have to answer questions weighs against custody. As to the conflict, the district court found the prosecutor credible, both after the suppression hearing in the initial order and at trial, he indicated again that he found the prosecutor credible. And that was the basis for his opinion. So conflicting statements were just due to not remembering things in terms of like there was the police officer saying various things happened. Prosecutors. This is DeVillers. Is that correct? The conflict was a very low level one. There was no conflict about what the Mr. Holt actually said during the interview. And there was no conflict about warnings that were given. The fact that warnings were given at the trial. Mr. Gillette, who testified, indicated that he didn't remember when warnings were given. He indicated that the right to remain silent and free to leave were given before questioning started. But when they asked several other questions about which warnings had been given, when he indicated that he didn't remember, which was, I think, different than his testimony in the suppression hearing. So there was no conflict about the content of Mr. Holt's statement or the fact that warnings were given or even the timing of the core warnings here that this court has indicated were important. So I think it's worth saying that there is no conflict, but also that the district court found Mr. DeVillers credible. And that's difficult to reverse. As to the tape recording, the lack of tape recording here could be significant in a case in which there was conflicting testimony about what the statement actually was. Here, there is not. Mr. Holt's statement has been presented without objection. The district court found the description of the statement or the circumstances of the statement credible. So the lack of tape recording here does not weigh against credibility and credibility was found in any case. So here, I don't think that the lack of tape recording is significant, unless there are additional questions. I think there are not. Thank you, counsel. Thank you. Rebuttal? It doesn't make any difference what the content of the statement was as far as this issue goes, because the process wasn't correct. And if we base decisions of Miranda on what is ultimately said, why worry about the process? That makes no sense. The partial warnings are really important to look at. I'm going to try to aid the court in answering a couple of the questions there. If you look at the testimony, and I understand the credibility determination, but the court should have looked at this and didn't. The court says its initial denial was based on the testimony of the AUSA developers. That's at 1521, page 15701. At the second hearing during the trial, again, I don't think this is proper, the AUSA admits there are inconsistencies, which is correct, but he vouches for his own testimony in the suppression hearing. He refers back to that and says, Judge, I told you the truth. He's a litigator in the case, and now he's vouching for his own testimony as a witness. I don't think that's proper. Gillette, the state officer, does a general summary. We don't have it recording, but he does a general summary 15 days after this interview takes place. It's not meant to be an actual representation of what happened, but he doesn't mention any of this as it relates to when these statements were taken. Gillette testifies at the first suppression hearing, 1090, 8811, and 8814, that DNA and photographs are not initially taken. They were taken during the interview, but I don't know when he was told he could leave. His testimony is different at the second hearing, trial transcript 1521, page 15683. He states, Holt was advised of his rights. He was free to go at any time. Gillette later says, he later, Holt, was given the warnings, but not until at or near the end of the questioning. That's the trial testimony. 1521, page 1593, I believe it is. I have the wrong site there. He testifies that he's the primary questioner. DeVillers has testified that he's the primary questioner. These aren't little inconsistencies, they're big ones as it relates to Mr. Holt and the circumstances he was in. Zeckman testifies at the first suppression hearing, Holt is told he could leave after Laubert took the photograph. Nobody else testifies to that. They never tell you when the DNA samples were taken and they never take the handwriting sample. The other point that I want to make is the government seems to say this is a harmless error. If there is error, they argue that in their brief. It can't be harmless because this is a partial confession. It's this confession that ties Mr. Holt, at least in part, back to the RICO conspiracy. In a close case, like the district court admits, this is a very close case, he thinks that Reynolds, the organizer, is a freelancer and some of these actions are not taken, maybe all of them are not taken as a part of the conspiracy. It's more likely than not that DeJoy looked at the statement that was made that was admitted to trial to break the tie on linking him back to the RICO. He's serving life plus 25 for murder and aid of racketeering. The error that occurred is not harmless. Thank you. Thank you, counsel. There being no further cases to be argued this morning, the clerk may adjourn the court. Oh, except I forgot to mention, we appreciate your service as CJA counsel.